IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RICHARD B. PETTIT,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　　) CIVIL ACTION NO.: 1:22-cv-00162
　　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
HARTFORD LIFE AND ACCIDENT　　　　)
INSURANCE COMPANY[1],　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　Defendant.　　　　　　　)
_____

## COMPLAINT

The Plaintiff, Richard B. Pettit, does hereby state the following:

### Action

1. This is an action for declaratory, compensatory, and injunctive relief based on the Plaintiff's rights to long term disability income benefits arising under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et. seq. (hereinafter "ERISA"), and more particularly 29 U.S.C. § 1132(a)(1)(B). The jurisdiction of this Court is invoked pursuant to 29 U.S.C. § 1132(e).

### Parties

2. The Plaintiff, Richard B. Pettit, is a resident of Forsyth County, North

---

[1] The North Carolina Department of Insurance through the National Association of Insurance Commissioners lists the Defendant company name as Hartford Life & Accident Insurance Company. However, the name is listed as Hartford Life and Accident Insurance Company on the Certificate of Insurance of the policy identified herein, as well as on the signature page of the policy which was provided by the Defendant insurance company.

1

Carolina. At the onset of the Plaintiff's disability, Plaintiff was an "employee" of BB&T Corporation (now Truist Financial Corporation and referred to as "BB&T Corporation" hereinafter), within the meaning of 29 U.S.C. § 1002(6).

3. The Defendant, Hartford Life and Accident Insurance Company (hereinafter referred to as the "Hartford" and also known as "Hartford Life & Accident Insurance Company (see fn1)), is a corporation or company licensed to transact business in North Carolina. Upon information and belief, the Hartford is generally engaged in the insurance business. As more specifically described below, at all times pertinent to this action, the Hartford insured the Plan which provided long term disability income coverage to the Plaintiff as well as other employees of BB&T Corporation. Upon information and belief, the Hartford had discretionary authority to administer claims brought under the Plan and was assisted in this process by its agents, affiliates, or subsidiaries including, but not limited to, Benefit Management Services. Accordingly, the Hartford is a "fiduciary" of the Plan within the meaning and definition of 29 U.S.C. § 1002(21).

### The Plan

4. Defendant Hartford entered into an agreement with BB&T Corporation, to provide group long term disability income coverage to its employees. This agreement was formalized in a policy that was issued to BB&T Corporation under Group Insurance Policy No. GLT-674861. The policy and Plan constitute an "employee welfare benefit

plan," as defined by 29 U.S.C. § 1002(1).

5. The Plan, as contained in the written policy identified above, provides that any employee who is disabled due to sickness or injury is, after an "elimination period", entitled to a percentage of his or her basic monthly earnings each month during the period of disability for the "maximum duration of benefits".

6. During his employment with BB&T Corporation, the Plaintiff participated in the Plan and was, at the time his disability began, a fully vested member of the Plan. Accordingly, Plaintiff was a "participant" of the Plan within the meaning and definition of 29 U.S.C. § 1002(7).

**Facts**

7. The Plaintiff is presently 54 years of age.

8. The Plaintiff started working for BB&T Corporation on or about May 7, 2001, and worked there continuously and was working as an Applications Systems Architect when he was forced to stop working on or about September 1, 2017, because of cognitive deficits from a traumatic brain injury.

9. The Plaintiff applied for and was awarded short term disability benefits through the Defendant.

10. The Plaintiff applied for and was awarded long term disability benefits through the Defendant with a start date on or about March 4, 2018.

11. On or about February 6, 2018, the Defendant referred the Plaintiff to Allsup

3

for representation in his claim for Social Security Disability benefits.

12. On or about December 3, 2018, the Social Security Administration issued a decision finding that the Plaintiff became disabled on September 5, 2017.

13. On October 13, 2020, the Plaintiff underwent an independent medical examination at the request of the Defendant. The examination was performed by Dr. Alvin K. Antony. In conclusion, Dr. Antony opined, among other things, that the Plaintiff was able to sit for up to 8 hours per 8 hour workday with rest breaks every 120 minutes for stretching and he could stand for up to 90 minutes per 8 hour workday with rest breaks every 30 minutes. Dr. Antony further opined that the claimant could walk for up to 3 hours per 8 hour workday for 30 minute intervals with sitting rest breaks every 30 minutes.

14. Upon information and belief, the Defendant paid Dr. Antony $2,695 for the independent medical examination.

15. On January 7, 2021, Dr. Aaron Hervey performed an independent medical examination that included a neuropsychological evaluation. Following his examination, Dr. Hervey opined that the Plaintiff did not have any functional limitations from a cognitive/psychological perspective.

16. According to Dr. Hervey's report, "[t]he claimant produced failing scores on six of six measures of performance validity, using cutoff scores appropriate to the claimant's background. This includes scores from three standalone tests and three

4

embedded measures. Theoretical reasons for the choice of validity measures are available on file, as is information demonstrating that the use of these measures results from low false positive rate … [t]his approach indicated that the test results were considered invalid."

17. According to Dr. Hervey's report, the Plaintiff's "response set on the MMPI-2-RF was reliable and valid, with no elevated reliability or validity scales."

18. Upon information and belief, the Defendant paid Dr. Hervey $5,685 for the independent medical examination.

19. In an "Employability Analysis" dated January 29, 2021, the Defendant opined that the Plaintiff could work as a Software Engineer.

20. In a letter dated February 3, 2021, the Defendant notified the Plaintiff that his long term disability benefits were being terminated on February 2, 2021, because the Plaintiff was no longer disabled. According to the Defendant, the Plaintiff retained the ability to return to work as a Software Engineer.

21. In a letter dated July 30, 2021, the Plaintiff specifically asked the Defendant for the "theoretical reasons for the choice of validity measures" that Dr. Hervey represented as being available on file and used in the neuropsychological evaluation.

22. In a letter dated July 30, 2021, the Plaintiff appealed the Defendant's decision to terminate his long term disability benefits and he requested additional time to submit documentation in support of his appeal.

5

23. In two submissions, the Plaintiff submitted, among other things, the following evidence supporting his claim for long term disability benefits:

- Neuropsychological evaluation dated August 24, 2021, administered by Dr. Laura Flashman that revealed cognitive deficits from the Plaintiff's traumatic brain injury.
- Questionnaire from Dr. Laura Flashman dated September 10, 2021, in which Dr. Flashman opined, among other things, that the neuropsychological evaluation revealed cognitive deficits for the Plaintiff, that he would not be able to perform a highly skilled job, that the Plaintiff suffers from mental fatigue, and that the surveillance video of the Plaintiff working around his house is not evidence of intact cognitive functioning.
- Responses from Dr. Laura Flashman dated October 6, 2021, in which Dr. Flashman opined, among other things, that she noticed persistence problems for the Plaintiff during testing but attributed it to the symptoms related to his accident, that neuropsychological testing should be objective but can be influenced by various factors, and that it should be clear to anyone that talks to the Plaintiff that he cannot return to work.
- Questionnaire from Dr. Steve Kirk dated September 17, 2021, in which Dr. Kirk opined, among other things, that it was reasonable for the Plaintiff to report various symptoms from his traumatic brain injury in 2016, that he agrees with the findings from the neuropsychological evaluation performed by Dr. Flashman, and that the Plaintiff suffers from mental fatigue secondary to a traumatic brain injury.

- Questionnaire from Dr. Jerry Brittain dated October 1, 2021, in which Dr. Brittain opined, among other things, that he has specialized in traumatic brain injuries; that the Plaintiff's medical history is consistent with a traumatic brain injury; that the Plaintiff could have cognitive deficits, mental fatigue, and mood disorders from his traumatic brain injury; that Dr. Flashman's findings are consistent with the Plaintiff's history of a traumatic brain injury; that the Plaintiff could not perform a highly skilled job; and that the Plaintiff suffers from mental fatigue.
- Vocational opinion from certified rehabilitation counselor, Michael A. Fryar, dated October 5, 2021. Mr. Fryar opined, among other things, that work as a Software Engineer is a highly skilled occupation that requires above average aptitude and excellent cognitive abilities. Moreover, according to Mr. Fryar, the "memory, attention, and executive function deficits as identified by Dr. Flashman" would make it impossible for the Plaintiff to work as a Software Engineer. Finally, Mr. Fryar opined that the Plaintiff would not be able to perform any occupation in the national economy that met the wage requirement based on the physical limitations set by Dr. Antony and the cognitive deficits identified by Dr. Flashman.
- Medical records from Raleigh Neurology Associates and MindPath Care Centers.
- Research article by the International Journal of Environmental Research and Public Health entitled, "Mental Fatigue after Mild Traumatic Brain Injury in Relation to Cognitive Tests and Brain Imaging Methods".

24. In a letter dated August 10, 2021, the Defendant notified the Plaintiff that they had requested the raw data from Dr. Hervey's neuropsychological evaluation.

25. In a letter dated August 19, 2021, the Defendant notified the Plaintiff that "The Hartford is prohibited from requesting/releasing the raw data from [the Plaintiff's] January, 2021 Neuropsychological Independent Medical Examination unless the request is made by/released to a licensed Psychologist with a valid authorization allowing the release of the information."

26. In a letter dated November 4, 2021, the Defendant notified the Plaintiff that it had retained Dr. Daniel Cruz-Laureano to review the Plaintiff's medical records. According to Dr. Cruz-Laureano's report dated November 1, 2021, the medical evidence did not support any neuropsychological restrictions or limitations.

27. In response to Dr. Cruz-Laureano's report, Dr. Robert G. Dawkins, Jr., sent a letter dated November 9, 2021, to the Defendant in which he opined, among other things, that the Plaintiff could not function at an executive level and that even a mild traumatic brain injury can cause significant disability.

28. In response to Dr. Dawkins' letter and medical records, Dr. Cruz-Laureano issued a second report dated December 13, 2021. Dr. Cruz-Laureano concluded that the "additional records do not support evidence of impairment from a neuropsychological perspective and my opinion remain unchanged."

29. In a letter dated December 16, 2021, the Plaintiff responded to Dr. Cruz-

Laureano's report by sending the Defendant a research article entitled, "Mild Traumatic Brain Injury (mTBI) and Chronic Cognitive Impairment: A Scoping Review". In the article, the authors concluded, among other things, that the established literature recognizes that 15% of individuals that suffer a "mild" traumatic brain injury develop post-concussive syndrome with lasting cognitive deficits and that this percentage is likely a gross underestimate of the frequency with which this occurs.

30. In response to the research article, Dr. Cruz-Laureano issued his third report dated January 7, 2022. Dr. Cruz-Laureano opined that the research article did not provide evidence of a neuropsychological impairment and his opinions remained unchanged.

31. On or about January 12, 2022, the Plaintiff notified the Defendant that he did not have any additional evidence to submit in response to Dr. Cruz-Laureano's report.

32. In a letter dated January 13, 2022, the Defendant notified the Plaintiff that it had denied the Plaintiff's appeal because he retained the ability to work as a Software Engineer. The Defendant indicated that the Plaintiff has exhausted all administrative appeal procedures.

33. The Plaintiff has exhausted all administrative review procedures provided by the Plan.

**Claims for Relief**

34. Plaintiff hereby incorporates the foregoing paragraphs as if they were fully

9

set forth herein.

35. As stated above, the medical and other evidence shows that the Plaintiff has been totally disabled from any occupation since February 3, 2021. Accordingly, the Plaintiff is entitled to long term disability income benefits through the maximum duration of the Plan.

36. The Defendant's decisions to terminate the Plaintiff's benefits and to deny his appeal were not reasonable.

37. The Defendant's denial of long term disability benefits to the Plaintiff is a breach of the Plan and the terms of ERISA pursuant to 29 U.S.C. § 1001 et. seq.

38. As a direct and proximate result of the Defendant's breach of the Plan and violation of ERISA, Plaintiff has sustained losses, including the loss of benefits for his long term disability for which he is entitled to reimbursement.

39. Based on the Defendant's decision to terminate the Plaintiff's benefits and to deny his appeal, the Plaintiff is entitled to declaratory and injunctive relief establishing his entitlement to future disability benefits and requiring the Defendant to make such payments on a monthly basis through the maximum benefit period of the Plan.

40. The Plaintiff is entitled to recover his attorney's fees for his representation herein pursuant to 29 U.S.C. § 1132(g).

## Prayer for Relief

WHEREFORE, Plaintiff requests the following relief:

(1) That this Court issue a declaratory judgment that Plaintiff is entitled to long term disability income benefits under the Plan through the maximum benefit period as defined by the Plan;

(2) That Plaintiff recover from the Defendant all benefits to which he is entitled under the Plan;

(3) That Plaintiff recover pre-judgment and post-judgment interest on all amounts recovered herein;

(4) That Plaintiff recover the costs of this action, including reasonable attorney's fees pursuant to 29 U.S.C. § 1132(g); and

(5) That this Court award such other and further relief as it deems just and proper.

This the 1st day of March, 2022.

                                **/s/ John K. Koontz**
                                John K. Koontz
                                NC State Bar No.: 22156
                                Attorney for Plaintiff
                                Daggett Shuler, Attorneys at Law
                                2140 Country Club Road
                                Winston-Salem, NC 27104
                                Telephone No. (336) 724-1234
                                E-mail: jkoontz@daggettshulerlaw.com